## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

### CASE NO.: 6:23-cv-01209-WWB-LHP

**AMIRA HAMAD**, individually and on
behalf of similarly situated others;

**TAYLOR HARRINGTON**, individually
and on behalf of similarly situated others;

**ADRIENNE KRAFT**, individually and on
behalf of similarly situated others;

**JOLENE YEADO**, individually and on
behalf of similarly situated others;

**SHARON PINE**, individually and on behalf
of similarly situated others;

**TESS GAYNOR**, individually and on
behalf of similarly situated others;

**CAMILLE CRAWFORD**, individually and
on behalf of similarly situated others;

**JOANNE HINRICHS**, individually and on
behalf of similarly situated others;

**MASON SPRAGUE**, individually and on
behalf of similarly situated others;

**BEATA URBANOWICZ**, individually and
on behalf of similarly situated others; and,

**STEFANI GIMENEZ**, on behalf of her
Minor Child J.P.G., and on behalf of
similarly situated others;

     *Plaintiffs*,

v.

**FRONTIER AIRLINES, INC.**, a Colorado
Corporation,

**FIRST AMENDED CLASS ACTION
COMPLAINT AND DEMAND FOR
JURY TRIAL**

*Defendants.*

_____/

## FIRST AMENDED CLASS ACTION COMPLAINT

COMES NOW, Plaintiffs **AMIRA HAMAD**, **TAYLOR HARRINGTON**, **ADRIENNE KRAFT**, **JOLENE YEADO**, **SHARON PINE**, **TESS GAYNOR**, **CAMILLE CRAWFORD**, **JOANNE HENRICHS**, **MASON SPRAGUE**, and **BEATA URBANOWICZ**, each suing individually and on behalf of similarly situated others, and Plaintiff **STEFANI GIMENEZ**, suing on behalf of her Minor Child, J.P.G., and on behalf of similarly situated others, (collectively "Plaintiffs"), by and through their undersigned counsel, against Defendant **FRONTIER AIRLINES, INC.**, alleging Florida common law torts as well as violations of Florida's statutory laws; and in support thereof alleges the following:

## NATURE OF CASE

FRONTIER is <u>not</u> a budget airline, and it does <u>not</u> have the lowest airfares. Instead, FRONTIER just breaks its fees into tiny little pieces and checkpoints so as to hide and water-down what is actually an average airfare, when combined and compared to other airlines in the industry. FRONTIER takes advantage of consumers and gorges itself with the unjust hidden fees paid to it by unsuspecting, innocent consumers, such as the Plaintiffs in this class action. FRONTIER's bait-and-switch, "gotcha" tactics are designed to confuse, trick, and trap consumers into paying additional, hidden fees that often times are 2-3 times their airfare alone. For example, FRONTIER represents that all airfares include 1 free "personal item" but fails to mention that its bag sizers used to measure the "personal items" are smaller than the advertised dimensions. In other instances, a "personal item" will unambiguously fit inside FRONTIER's "personal item" bag sizers, but FRONTIER's gate agents charge the passenger a $99.00 fee willy-nilly for "carry-on"

bags, because they receive a commission from FRONTIER for doing so. The Plaintiffs bring this class action to address FRONTIER's fraudulent, unethical, and unlawful conduct and omissions relating to its advertising and sale of airfare tickets to consumers in the State of Florida and Nationwide, and they seek to be compensated for their losses caused by FRONTIER's shady business dealings relating to FRONTIER's advertising, ticketing, and Plaintiffs' not-so-free "personal items." FRONTIER took great acre in creating the fraudulent and misleading sales practices identified in this class action, and the Plaintiffs seek to hold FRONTIER responsible for its misconduct and unlawful business practices.

## PARTIES

1.      **AMIRA HAMAD** ("HAMAD") is a citizen of the United States who resides in the State of Florida, and the Lead Plaintiff in this action who brings individually and on behalf of similarly situated others. HAMAD purchased a ticket to fly FRONTIER on May 11, 2023, and was charged $99.00 by FRONTIER for her "personal item" at the gate on that date.

2.      **TAYLOR HARRINGTON** ("HARRINGTON") is a citizen of the United States who resides in the State of Florida, who brings this action individually and on behalf of similarly situated others. HARRINGTON purchased a ticket to fly FRONTIER on March 12, 2023, and was charged $99.00 by FRONTIER for his "personal item" at the gate on that date.

3.      **ADRIENNE KRAFT** ("KRAFT") is a citizen of the United States who resides in the State of Colorado, who brings this action individually and on behalf of similarly situated others. KRAFT purchased a ticket to fly FRONTIER on June 6, 2023, June 13, and June 27, and was charged a total of $297.00 by FRONTIER for her "personal item" at the gate on that date.

4.      **JOLENE YEADO** ("YEADO") is a citizen of the United States who resides in the State of Colorado, who brings this action individually and on behalf of similarly situated others.

YEADO purchased a ticket to fly FRONTIER on May 11, 2023, and was charged $99.00 by FRONTIER for her "personal item" at the gate on that date.

5.      **SHARON PINE** ("PINE") is a citizen of the United States who resides in the State of Colorado, who brings this action individually and on behalf of similarly situated others. PINE purchased a ticket to fly FRONTIER on January 11, 2023, and was charged $99.00 by FRONTIER for her "personal item" at the gate on that date.

6.      **TESS GAYNOR** ("GAYNOR") is a citizen of the United States who resides in the State of Florida, who brings this action individually and on behalf of similarly situated others. GAYNOR purchased a ticket to fly FRONTIER on May 18, 2023, and was charged $99.00 by FRONTIER for her "personal item" at the gate on that date.

7.      **CAMILLE CRAWFORD** ("CRAWFORD") is a citizen of the United States who resides in the State of Florida who brings this action individually and on behalf of similarly situated others. CRAWFORD purchased a ticket to fly FRONTIER on April 6, 2023, and was charged $99.00 by FRONTIER for her "personal item" at that gate.

8.      **JOANNE HINRICHS** ("HINRICHS") is a citizen of the United States who resides in the State of Florida and brings this action individually and on behalf of similarly situated others. HENRICHS purchased a ticket to fly FRONTIER on April 19, 2023, and was charged $99.00 by FRONTIER for her "personal item" at the gate on that date.

9.      **MASON SPRAGUE** ("SPRAGUE") is a citizen of the United States who resides in the State of Wisconsin and brings this action individually and on behalf of similarly situated others. SPRAGUE purchased a ticket to fly FRONTIER on May 28, 2023, and was charged a total of $138.00 by FRONTIER for his and his wife's two (2) "personal items" at the gate on that date.

10.     **BEATA URBANOWICZ** ("URBANOWICZ") is a citizen of the United States who resides in the State of Illinois and brings this action individually and on behalf of similarly situated others. URBANOWICZ purchased five (5) tickets to fly FRONTIER on April 29, 2023, and was charged a total $495.00 for her "personal item" and four (4) of her friends' "personal items" at the gate on that date.

11.     **STEFANI GIMENEZ** ("GIMENEZ") is a citizen of the United States who reside in the State of Texas, who brings this action on behalf of her Minor Child J.P.G., individually, and on behalf of similarly situated others. GIMENEZ purchased a ticket for J.P.G. to fly FRONTIER on July 7, 2023, and her minor child J.P.G. was charged $99.00 by FRONTIER for his "personal item" on the connecting flight at MCO at the gate on that date.

12.     **FRONTIER AIRLINES, INC.** ("FRONTIER"), does regular and continuous business in the State of Florida, within this judicial district. FRONTIER is a Colorado-based airline, with its principal place of business at 4545 Airport Way, Denver, CO 80239.

## JURISDICTION AND VENUE

13.     This Court also has subject-matter jurisdiction to adjudicate the claims set forth herein under the provision of the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because (1) the matter in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs, (2) the action is a class action, (3) there are members of the Class who are diverse from the FRONTIER, and (4) there are more than 100 class members.

14.     Personal jurisdiction and venue in this judicial district are proper in that FRONTIER has continuous and systemic operations out of Florida airports, including Orlando International Airport (MCO), in Orlando, Florida, where FRONTIER operates in a manner that

violates Florida laws, consistent with Plaintiffs' allegations. Conduct herein alleged, including the unfair and deceptive trade practices and the resulting harm, occurred within this judicial district.

15.     Venue is also proper in this judicial district pursuant to 28 U.S.C. § 1391, because FRONTIER transacts business in this district, is subject to personal jurisdiction in this district, and therefore is deemed to have minimum contacts to avail itself to this district. Additionally, FRONTIER has advertised in this district and has received substantial revenue and profits from its ticket sales in this district; therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this district.

## GENERAL FACTUAL ALLEGATIONS

16.     FRONTIER purports "to save you money on your flights," and "to not only offe[r] the lowest fares," and provides a "unique brand of Low Fares Done Right®," in which it "believe[s] The Sky is for Everyone®."[1]

17.     However, FRONTIER's advertised prices are misleading and the total cost to consumers flying with FRONTIER is not "the lowest fares," as advertised by the airline.

18.     FRONTIER purports to offer and maintain "the lowest" total prices to consumers compared to other airlines by utilizing its "unique brand of Low Fares Done Right®" ("LFDR") business model.

19.     However, FRONTIER's LFDR business model is nothing more than a bait and switch scheme designed to defraud consumers.

20.     FRONTIER does not make its fee structure clear to consumers at the time of purchase, especially when consumers purchase FRONTIER tickets through third party vendors.

---

[1] https://www.flyfrontier.com/about-us/

21.     FRONTIER's fees are not conspicuously shown on its website or on the websites of third-party vendors, and consumers are often unaware of FRONTIER's large and plentiful fees until after they purchase a ticket that initially appeared attractive.

22.     FRONTIER intentionally hid fees from Plaintiffs and other similarly situated consumers during the booking process in order to fraudulently induce sales.

23.     FRONTIER's practices are designed to trap consumers into paying fees that consumers do not expect to incur at the time of booking.

24.     For instance, FRONTIER advertised to customers that one (1) personal item is included with each ticket and defines "personal items" as those that are not larger 14" height by 18" width by 8" depth (*i.e.*, 14"H x 18"W x 8"D), "including handles, wheels, and straps."[2]  (*See* *FIGURE 1*, below.)

### *FIGURE 1*



**Personal Item**

One Included

Size: 14"H X 18"W X 8"D including handles, wheels and straps

Think purses, totes, computer bags, briefcases, diaper bags and kids backpacks

NOTE: **The size of your personal item will be checked during boarding. Items larger than the allowed dimensions are subject to an additional charge.**

---

[2] https://www.flyfrontier.com/travel/travel-info/bag-options/

25.     FRONTIER, without specificity, states that "items larger than the allowed dimensions [for Personal Items] are subject to an additional charge,"[3] but does not explain that the "additional charge" for those items is $99.00 at the departure gate.

26.     Not only does FRONTIER not adequately explain the nature of its baggage fees at the time of ticket purchase, but FRONTIER also displays a grossly skewed bag sizer at the gate that is smaller than the allowed 14"H x 18"W x 8"D dimension for Personal Items.

27.     Because FRONTIER does not clearly and conspicuously, or even accurately, disclose and display the included Personal Item measurements, consumers are unable to avoid the $99.00 baggage fee at the gate for "oversized" personal items.

28.     FRONTIER deceives consumers as to what this fee is and tricks consumers into paying for personal items that were already included in the ticket price they paid for.

29.     FRONTIER, when confronted about the dimensions of the personal-item bag sizer at the gate, claims that the dimensions are the same as those advertised on its website (14"H x 18"W x 8"D), but FRONTIER intentionally limits the actions consumers can take on their website so that the customer whose bag qualifies as a "personal item" will appear to exceed the allowed size when they attempt to fit it in the shrunken display at FRONTIER's gates.

30.     The dimensions of Plaintiffs' bags are within the 14"H x 18"W x 8"D that FRONTIER advertises to be included in the purchase price of the ticket (*i.e.*, FRONTIER purports to allow one *free* personal item).

31.     Notably, FRONTIER does not identify the dimension of its bag sizer on the actual bag sizer, which, in effect, prevent the consumer from objecting to the bag sizer in-person and

---

[3] https://www.flyfrontier.com/travel-info/bag-options/

allows FRONTIER to induce the consumer into paying the additional fees under the duress of timely boarding their flight.

32.     Furthermore, FRONTIER fails to adequately explain to consumers before purchase that bags are more expensive at the gates.

33.     As displayed in FIGURE 3, the size of HAMAD's personal item falls well within the dimensions advertised by FRONTIER as a "personal item" (*i.e.*, 14"H x 18"W x 8"D).

34.     Spirit's bag sizer purported to be the exact measurements that FRONTIER advertised online (*i.e.*, 14"H x 18"W x 8"D), and even had these dimensions displayed on the actual bag sizer for consumers to verify.

35.     FRONTIER engages in a pattern and practice of withholding certain material information regarding the total pricing of a flight until consumers have expended resources and are irreversibly committed to taking the flight, or, *e.g.*, carrying on a personal item.

36.     FRONTIER fails to specifically inform consumers about its hidden fees, and it falsely advertises that it offers "the lowest fares" as a standard product.

37.     Upon information and belief, FRONTIER provides inaccurate information to consumers about personal items and baggage fees, or both. Hidden within FRONTIER's online F.A.Q.'s is a definition for "Personal Items," as seen in *FIGURE 2*, below.

### *FIGURE 2*

Home » Bags and Seats » Bags & Seats General Info

## What are the sizes and weight limits for bags?

**Personal Items:** Personal items can be no larger than 14" tall, 18" wide, and 8" long. Personal items *must* fit completely within the personal item portion of the bag sizer. Think purses, totes, computer bags, briefcases, and kids backpacks!

38.     FRONTIER fails to inform its consumers that "the personal item portion of the bag sizer" is **not** "14" tall, 18" wide, and 8" long"; in fact, FRONTIER hides the fact that its personal item portion of the bag sizers are much smaller than that. (*See*, *e.g.*, _FIGURE 2_, above; *cf.* _FIGURE 14_ and _FIGURE 15_, below.)

39.     FRONTIER misleads consumers about the cost and quality of its "included" personal items and the fact that personal items are more expensive than carry-ons at the gate.

40.     FRONTIER does not offer refunds for baggage fees.[4]

41.     FRONTIER's baggage fee structure is misleading and designed to trick consumers into paying the maximum amount of fees *at the airport*.

42.     FRONTIER charges different amounts for carry-on baggage and checked baggage at different stages. For instance, customers pay the least for baggage fees if they pay for the bag online before they get to the airport. Once a customer arrives at the airport, the baggage frees increase incrementally at different points in the airport, up to a $99.00 baggage fee for bags paid for at the gate. Consumers, however, are not advised in advances that they would be paying the said penalty for bags that FRONTIER advertises as "included" in the fares.

43.     FRONTIER represented to Plaintiffs and the Class that the airfare amount was a clear representation of the total cost of the flight, but, after Plaintiffs and similarly situated others purchased their tickets, they were presented with a plethora of additional unexpected fees that made their flights substantially higher than represented by FRONTIER at the ticket checkout.

44.     Because of FRONTIER's representations, the Plaintiffs believed that the ticket she purchased would get her from points A-to-B and B-to-A for the advertised price.

---

[4] https://faq.flyfrontier.com/help/bags-seats-general-info-how-much-does-frontier-charge-for-bags

45.     However, Plaintiffs and similarly situated others had to pay additional unanticipated and hidden fees, such as a high baggage fee at the gate in the amount of $99.00 (sometimes greater than the cost of the airfare) for each passenger's "personal item."

46.     FRONTIER also represented to the Plaintiffs and similarly situated others that they would be able to fit a 14"H x 18"W x 8"D "personal item" in the bag sizer, but when the Plaintiffs and similarly situated others were at the FRONTIER's gate, the bag sizer was smaller than advertised and/or it was not applied consistently.

47.     FRONTIER represented to Plaintiffs and similarly situated others that it provided the "lowest fares," but did not inform Plaintiffs that their fairs did not accurately represent the additional fees they would have to pay at the airport.

48.     FRONTIER was not transparent with Plaintiffs and similarly situated others (collectively "consumers") that, despite claiming FRONTIER's fares included one free "personal item," the bag sizer was smaller than the dimension it advertised as "personal items" and/or the dimensions of their "personal items" did not matter.

49.     FRONTIER incentivized its employees, such as its gate agents, to abuse the enforcement of FRONTIER's "personal item" bag sizer, by providing bonuses for each "personal item" that the gate agents are able to charge as "carry-on" bags at the gate, regardless of their sizes and whether they fit inside the bag sizers.[5]

### (Purchasing Tickets Online)

50.     FRONTIER is simply disingenuous about its tickets and baggage fees, and what is included in the fares it charges to consumers.

---

[5] https://nypost.com/2023/03/11/frontier-airlines-admits-staff-get-bonus-for-charging-oversized-luggage-fees/.

51.     FRONTIER hides its fees in various ways to confuse and overwhelm a consumer into purchasing (intentionally and unintentionally) additional packages and features.

52.     These fees, however, are inconspicuously shown right before the consumer completes the purchase—not at the beginning with the advertised fares.

53.     In many situations, FRONTIER will only show the stripped-down airfare that is only available to consumers who join FRONTIER's Discount Den ($59.99 per year plus a $40.00 enrollment fee), and, if the consumer is not a club member, the advertised price if lower than the price that applies to them.

54.     FRONTIER takes consumers through a belligerent series of sales pitches and misleading statements (*e.g.*, "If you do not select a seat now, you will be randomly assigned a seat from the remaining selection at check-in")[6].

55.     Nine screens later, FRONTIER finally reveals the full breakdown of the consumer's fare, which FRONTIER hides its fees is on the last screen of FRONTIER's online ticket purchasing process, concealed behind a drop-down menu, where a consumer can reveal *some* of the fees associated with their ticket purchase.

56.     Some of the fees shown in FRONTIER's fare are for FRONTIER's "interface charge" (from $26.00 to $46.00).

57.     FRONTIER's breakdown makes it look as if the interface charge is a government tax, but it is not.[7]

---

[6] https://www.flyfrontier.com/travel-information/seating-options/select-seating/.
[7] *See*, *e.g.*, *FIGURE 11* and *FIGURE 12* below.

58.     In comparison, if a consumer flies with FRONTIER as a normal passenger—with a carry-on, checked bag, seat assignment, and agent assistance—the FRONTIER ticket price can increase more than 400% from the advertised ticket fare.[8]

59.     During the purchasing process, FRONTIER hides terms that it seeks to enforce should consumers seek compensation or refunds for FRONTIER's conduct.

60.     Once a consumer selects their flights (*e.g.*, for round-trip tickets, selecting departing and return FRONTIER flights), the consumer is provided an opportunity to "review flight summary." (*See*, *FIGURE 3*, below.)

*FIGURE 3*



61.     After selecting "continue" from the screen in *FIGURE 3* (above), the consumer is directed to a second screen where the consumer enters the "PASSENGER INFORMATION."

---

[8] https://www.seattletimes.com/life/travel/how-airlines-hide-the-true-cost-of-travel/.

62.     After selecting "continue" from the "PASSENGER INFORMATION" screen, the consumer is then inundated with belligerent sales pitches and confusing computations for their ticket fare on a "BUNDLE IT" screen. (*See* <u>*FIGURE 4*</u>, below.)

<u>***FIGURE 4***</u>



63.     All FRONTIER bundles in <u>*FIGURE 4*</u> (above) include a free "Personal Item" and all bundles list "carry-on bag" beneath them but do not specific what that means unless the consumer specifically reveals the drop-down information under each.

64.     FRONTIER's advertised fees represent that "YOUR PRICE" is, for example, $106.00 for "THE PERKS" bundle, and, only in the fine print explain that the "your price" is actually $212.00 because it is $106.00 *multiplied by* the number of passengers and the directions (*i.e.*, departing and returning).

65.     When the consumer continues from the "BUNDLE IT" screen, they are immediately directed to "SELECT YOUR SEATS," even if the consumer has not indicated that they wish to purchase a seat selection. (*See FIGURE 5*, below.)

*FIGURE 5*



66.     FRONTIER does not inform the consumer that the seat selections are additional fees; it merely provides the seating chart with "Stretch" seats in blue, "Standard" seats in green, and "Unavailable" seats in shaded-green.  (*See FIGURE 5*, above.)

67.     FRONTIER does not inform consumers that the dollar values stated on the green "Standard" seats are <u>not</u> included in the consumer's "Standard" fare. (*See FIGURE 5*, above.) In fact, nowhere other than in *FIGURE 5* does FRONTIER define or otherwise label the consumer's ticket as "Standard."

68.     If the consumer attempts to "continue" without selecting a seat, FRONTIER sends the consumer a pop-up telling the consumer to "HANG ON!" and then misleads the consumer into

selecting a button that says, "**YES! I DO WANT TO CHOOSE** [a seat]," which is highlighted in bold, capitalized, with a green shaded background, similar to the "continue" buttons, compared to the button that declines the seat selection and states, "No Thanks. I'll take whatever," in fine print. (*See <u>FIGURE 6</u>*, below.)

<u>***FIGURE 6***</u>



69.     FRONTIER takes another sales pitch to the consumer, but again fails to mention that the seat selection is an additional fee to their initial ticket fare. (*See <u>FIGURE 6</u>* above.)

70.     When the consumer selects "No thanks. I'll take whatever." they are then directed to the "BAG CHOICES" screen. (*See FIGURE 7* below.)

*FIGURE 7*



71.     On this screen, the consumer is asked to select from various confusion baggage options, including a carry-on bag (24"H x 16"W x 10"D and under 35 lbs.), checked bags (62 linear inches and under 40 lbs.), and a "FREE PERSONAL ITEM." (*See FIGURE 8* below.)

*FIGURE 8*



72.     FRONTIER states that a "FREE PERSONAL ITEM" is included for each passenger in each direction with the consumer's fare, and that the dimensions of the "personal

item" are 14"H x 18"W x 8"D including the handles and wheels of the "personal item." (*See* <u>*FIGURE 8*</u> above.)

73.     If the consumer selects "continue" from the "BAG CHOICES" screen without selecting a carry-on bag, FRONTIER will prevent the consumer from continuing and present an error message stating, "ERROR: Please select carry-on baggage option." (*See* <u>*FIGURE 9*</u> below.)

<u>*FIGURE 9*</u>



74.     The consumer must then select "no carry-on" and "no [checked] bags" before they can "continue" to the next screen in the purchasing process.

75.     The next screen is the "COMPLETE YOUR TRIP" screen, where the consumer is not actually able to "complete" their trip, but instead is inundated with more disorganized sales pitches from FRONTIER, including promotions for priority boarding, "insuring your trip," rental car deals, "agent services," and "recommended for you" (*i.e.*, redundant sales pitches for optional products that the consumer already declined in previous phases of the purchase process).

76.     Interestingly, FRONTIER charges the consumer an additional $20.00 if the consumer "needs help at the Airport for things like buying bags, seats, checking in, or printing a boarding pass." This unconscionable fee is further exacerbated by the fact that it is $20.00 per

passenger, per direction (*i.e.*, on a round-trip ticket, it would be $40.00) and FRONTIER leaves it to the customer to do the math before selecting this additional fee.

77.     When the consumer selects "continue" from this screen, they are directed to the "ORDER SUMMARY" page. (*See FIGURE 10* below.)

*FIGURE 10*



78.     On this page, FRONTIER hides additional and hidden fees in arbitrary drop-down compartments, and hides "taxes and Carrier Imposed Fees" behind an inconspicuous drop-down chart without an arrow—instead FRONTIER uses "[+]" to *technically* inform the consumer that there is a drop-down itemized chart of taxes and fees. (*See FIGURE 11* below. *Cf. FIGURE 12* below.)

*FIGURE 11*



### *FIGURE 12*

| Taxes and Carrier Imposed Fees [-] | |
|---|---|
| | × |
| **US1** - U.S. Transportation Tax | $12.92 |
| **CIC** - Carrier Interface Charge (Non-Refundable) | $46.00 |
| **AY1** - U.S. Passenger Security Fee | $11.20 |
| **ZP** - U.S. Domestic Flight Segment Tax | $9.60 |
| **XF** - Orlando, Fl (MCO) Passenger Facility Charge | $4.50 |
| **XF** - Atlanta, Ga (ATL) Passenger Facility Charge | $4.50 |
| **TOTAL PAYMENT DUE** | **$260.96** |

79.     In any event, and the consumer's attention is directed to inputting their "payment information." The consumer is not required by FRONTIER to check or acknowledge any boxes any terms or fees before entering payment and billing information.

80.     Once the consumer enters the payment and billing information, nothing further is required by FRONTIER for them to complete their purchase.

81.     FRONTIER does not require the consumer to read, review, or acknowledge its "Terms and Conditions" or "Contract for Carriage."

82.     The only time FRONTIER mentions its "Terms and Conditions" and "Contract for Carriage" is in the fine print intentionally and inconspicuously tucked under the consumer's "billing information." (*See* *FIGURE 13* *below*.)

### *FIGURE 13*



83.     The linked "Terms and Conditions" are a myriad of more additional and confusing links, and the "Contract for Carriage" link does not open in the consumer's browser and must be downloaded, which in turn requires that the consumer have certain software on their device to do so.

84.     Neither FRONTIER's "Terms and Conditions" nor its "Contract for Carriage" were properly or validly offered to the Plaintiffs and the similarly situated others during their ticket purchasing process.

85.     Neither FRONTIER's "Terms and Conditions" nor its "Contract for Carriage" were assented to by the Plaintiffs and the similarly situated others during their ticket purchasing process.

86.     Plaintiffs and similarly situated others could not reasonably expect to be bound to FRONTIER's "Terms and Conditions" or its "Contract for Carriage," because:

(a)     They each lacked notice of the "Terms and Conditions" and "Contract for Carriage";

(b)     The nature and burden of the "Terms and Conditions" and "Contract for Carriage" are not reasonably clear to the average consumer during FRONTIER's ticket purchase process;

(c)     The potential for unfair surprise in the "Terms and Conditions" and "Contract for Carriage" are severe and, in the instant action, included waivers of their constitutional rights to a jury trial and their right to bring a class action;

(d)     The "Terms and Conditions" and "Contract for Carriage" create unequal bargaining power and attempt to undermine the express warranties provided to them by FRONTIER; and,

(e)     The "Terms and Conditions" and "Contract for Carriage" are substantively unfair in that they violate statutory laws as alleged herein.

87.     FRONTIER did not require Plaintiffs and similarly situated others to affirmatively and unambiguously manifest assent to its "Terms and Conditions" or "Contract for Carriage."

88.     FRONTIER did not obtain affirmative consent to its "Terms and Conditions" or its "Contract for Carriage," from the Plaintiffs or the similarly situated others. FRONTIER did not require them to click, *e.g.*, "I agree" before proceeding with their purchases. Nor did FRONTIER require them to check a box indicating "I agree." As such, the Plaintiffs and similarly situated others never affirmatively demonstrated that they took affirmative action in agreeing to the "Terms and Conditions" or the "Contract for Carriage."

89.     FRONTIER failed to provide each Plaintiff and similarly situated other with conspicuous notice of its "Terms and Conditions" and "Contract for Carriage."

90.     FRONTIER failed to provide prominent notice of the "Terms and Conditions" and "Contract for Carriage" to the Plaintiffs and similarly situated others. FRONTIER's "Terms and Conditions" and "Contract for Carriage" were not displayed prominently to the Plaintiffs and similarly situated others, and they were not encouraged or required to read the "Terms and Conditions" or "Contract for Carriage" before clicking "Purchase & Accept."

91.     FRONTIER did not use an acceptance method for the "Terms and Conditions" or "Contract for Carriage," let alone one that was easy-to-use for the Plaintiffs and similarly situated others. For example, FRONTIER did not even use a "clickwrap" agreement whereby the Plaintiffs and similarly situated others could "agree" to the "Terms and Conditions" or "Contract for Carriage" with checked box or other required action.

92.     FRONTIER failed to maintain back-end records of the "Terms and Conditions" or "Contract for Carriage" that applied to each of the Plaintiffs and similarly situated others.

93.     Specifically, FRONTIER cannot show who, if any, accepted the "Terms and Conditions" or "Contract for Carriage," the versions accepted, or how and when it was accepted by the Plaintiffs and similarly situated others.

94.     Therefore, FRONTIER's "Terms and Conditions" and "Contract for Carriage" is not binding or enforceable on the Plaintiffs and similarly situated others.

### (Facts Relative to Plaintiff AMIRA HAMAD)

95.     HAMAD realleges paragraphs 1 through 94.

96.     HAMAD purchased a ticket to fly FRONTIER from MCO to Raleigh (RDU), on May 11, 2023 (Flight 1660).

97.     FRONTIER's "personal item" bag sizer however was smaller than advertised, which prevented HAMAD's "personal item" from fitting inside. (*See FIGURE 14* below.)

### *FIGURE 14*



98.     The bag sizer used to measure HAMAD's "personal item" was drastically smaller than the dimension advertised in *FIGURE 1* (above).

99.     HAMAD, on her return flight, took her personal item to Spirit Airlines' gate, where she measured the bag using Spirit's "personal item" bag sizer, which purported to be the same size as FRONTIER's "personal item" dimensions, in *FIGURE 1* (above). (*See FIGURE 15* below.)

*FIGURE 15*



100.    HAMAD was unable to use FRONTIER's website at the airport to resolve her disputed charges or identify the baggage fee that she was charged at the gate.

101.    HAMAD was told by FRONTIER's gate agents that the personal item bag sizer was 14"H x 18"W x 8"D, when it was in fact much smaller. (*See FIGURE 14* and *FIGURE 15* above.)

102.    When HAMAD realized the nature of the fraud, she confirmed her suspicions by showing that her personal item fit inside Spirit's personal item bag sizer, which had the same dimensions that FRONTIER purportedly had. (*See FIGURE 15* above.)

103.    HAMAD does not wish to continue doing business with a company that fraudulently induced her to purchase tickets and then trapped her into paying additional unanticipated fees based on a skewed bag sizer at the airport gate.

104.    FRONTIER represented that HAMAD's ticket included one (1) free "personal item" with the dimension identified in *FIGURE 1* (above).

105.    HAMAD relied on FRONTIER's representations when purchasing a ticket to travel with FRONTIER.

106.    HAMAD relied on FRONTIER's representations that one (1) free "personal item" was included with her FRONTIER ticket.

107.    HAMAD relied on FRONTIER's representations that a "personal item" was 14"H x 18"W x 8"D.

108.    HAMAD relied on FRONTIER's representations that they would not be subject to any hidden or additional fees for their "personal item" after purchasing her ticket from FRONTIER.

109.    HAMAD was reasonable in relying on FRONTIER's representations that the ticket prices was the full-fare price.

110.    Based on FRONTIER's representations, HAMAD found FRONTIER's ticket price to be attractive and thus purchased FRONTIER's ticket.

111.    FRONTIER's initial ticket price advertised to HAMAD induced PLAINTIFF into purchasing a FRONTIER ticket and caused HAMAD to attempt to board the flight with one (1) "personal item."

112.    HAMAD later found out that FRONTIER would charge an additional $99.00 fee that was hidden from them until they arrived at FRONTIER's gate to board the flight.

113.    Had HAMAD known that one (1) free "personal item" was not included in their ticket, HAMAD would have been able to make an informed decision as to whether to purchase the FRONTIER ticket and, if so, whether to purchase a "carry-on" at check-out for a significantly lower fee.

114.    FRONTIER's additional and hidden fee of $99.00 was charged to HAMAD even though their "personal item" was within the dimensions identified in *FIGURE 1*, above.

115.    FRONTIER's initial ticket price advertised to HAMAD was therefore false and misleading.

116.    As a result of FRONTIER's actions and omissions, HAMAD was harmed and suffered damages as herein alleged.

### (Facts Relative to Plaintiff TAYLOR HARRINGTON)

117.    HARRINGTON realleges paragraphs 1 through 94.

118.    HARRINGTON purchased a ticket to fly FRONTIER from Cleveland (CLE) to Fort Myers (RSW), on March 12, 2023, and when she arrived at the CLE gate, she was immediately pulled from the boarding line and instructed to pay for her "personal item."

119.    Yet, HARRINGTON's bag clearly fit inside the bag sizer. (*See FIGURE 16* below.)

### *FIGURE 16*



120. After placing his personal item in the bag sizer, FRONTIER's gate agent refused to answer HARRINGTON's questions and rushed to the next passenger in line.

121. HARRINGTON did as they were told and approached the ticketing counter.

122. HARRINGTON was then forced required to pay a $99.00 fee for his "personal item," even though it fit inside the bag sizer.

123. FRONTIER prevented him from boarding unless and until the fee was paid.

124. In reality, HARRINGTON's bag was a "personal item" and should have been free because it did not exceed 14"H x 18"W x 8"D. (*See FIGURE 17* below.)

*FIGURE 17*



125. However, HARRINGTON was not allowed to board their scheduled flight unless and until an additional and hidden fee of $99.00 was paid to FRONTIER for his "personal item."

126. HARRINGTON therefore paid the $99.00 for his "personal item" that had been represented as free when purchasing the ticket from FRONTIER on February 28, 2023.

127. FRONTIER represented that HARRINGTON's ticket included one (1) free "personal item" with the dimension identified in *FIGURE 1* (above).

128.     HARRINGTON relied on FRONTIER's representations when purchasing a ticket to travel with FRONTIER.

129.     HARRINGTON relied on FRONTIER's representations that one (1) free "personal item" was included with her FRONTIER ticket.

130.     HARRINGTON relied on FRONTIER's representations that a "personal item" was 14"H x 18"W x 8"D.

131.     HARRINGTON relied on FRONTIER's representations that they would not be subject to any hidden or additional fees for their "personal item" after purchasing her ticket from FRONTIER.

132.     HARRINGTON was reasonable in relying on FRONTIER's representations that the ticket prices was the full-fare price.

133.     Based on FRONTIER's representations, HARRINGTON found FRONTIER's ticket price to be attractive and thus purchased FRONTIER's ticket.

134.     FRONTIER's initial ticket price advertised to HARRINGTON induced HARRINGTON into purchasing a FRONTIER ticket and caused HARRINGTON to attempt to board the flight with one (1) "personal item."

135.     HARRINGTON later found out that FRONTIER would charge an additional $99.00 fee that was hidden from them until they arrived at FRONTIER's gate to board the flight.

136.     Had HARRINGTON known that one (1) free "personal item" was not included in their ticket, HARRINGTON would have been able to make an informed decision as to whether to purchase the FRONTIER ticket and, if so, whether to purchase a "carry-on" at check-out for a significantly lower fee.

137.    FRONTIER's additional and hidden fee of $99.00 was charged to HARRINGTON even though their "personal item" was within the dimensions identified in *FIGURE 1* (above).

138.    FRONTIER's initial ticket price advertised to HARRINGTON was therefore false and misleading.

139.    As a result of FRONTIER's actions and omissions, HARRINGTON was harmed and suffered damages as herein alleged.

**(Facts Relative to Plaintiff STEFANI GIMENEZ)**

140.    GIMENEZ realleges paragraphs 1 through 94.

141.    GIMENEZ purchased a ticket for her minor child to fly FRONTIER from Long Island McArthur Airport (ISP) to Dallas-Fort Worth (DFW), with a connection at MCO, on July 7, 2023.

142.    GIMENEZ' Minor Child J.P.G. ("J.P.G."), was subjectively targeted by a FRONTIER's gate agent while standing in line to board his flight.

143.    At that time, J.P.G. was going to be charged for his personal item, which was represented to GIMENEZ as being included in J.P.G.'s ticket.

144.    J.P.G. traveled with the same bag from ISP to DFW, on June 7, 2023, where he had a connection at MCO.

145.    J.P.G.'s "personal item" was not considered a "carry-on bag" at ISP—only when J.P.G. attempted to board at the MCO gate was his "personal item" then considered a "carry-on bag."

146.    On the morning of July 7, 2023, while waiting in line to board FRONTIER's flight, J.P.G. informed the gate agent that his bag was a "personal item."

147.   Without any sense of reality, the FRONTIER gate agent refused to acknowledge that J.P.G.'s bag was in fact not more than 14"H x 18"W x 8"D.

148.   FRONTIER's gate agent argued that J.P.G.'s "personal item" was oversized before J.P.G. placed it inside the FRONTIER "personal item" bag sizer.

149.   J.P.G. repeatedly asked the gate agent if he could  show her by placing his bag in FRONTIER's "personal item" bag sizer, but FRONTIER's gate agent refused to allow him to do so.

150.   A second FRONTIER gate agent agreed with J.P.G. and disagreed with the first gate agent, but FRONTIER still refused to accept that J.P.G.'s bag constituted a "personal item."

151.   J.P.G., a minor child traveling alone, then had no choice but to comply with FRONTIER's coercive conduct, because FRONTIER was refusing to let him board his flight unless and until he forfeited $99.00 to FRONTIER.

152.   As soon as he landed at his connecting airport, J.P.G. photographed his "personal item" placed inside a nearby FRONTIER "personal item" bag sizer. (*See FIGURE 18* below.)

*FIGURE 18*



153.    J.P.G. then inform FRONTIER's gate agent at DFW that he had been tricked into paying a "carry-on bag" fee for his "personal item" that fit inside the FRONTIER bag sizer.

154.    FRONTIER then agreed the $99.00 charge was erroneous.

155.    FRONTIER then offered J.P.G., which J.P.G. immediately accepted.

156.    FRONTIER's agent promised to make a note of this in FRONTIER's system.

157.    FRONTIER's agent informed J.P.G. that he would receive the $99.00 refund within 1-2 business days.

158.    Approximately seven (7) days, the refund still had not been received.

159.    Indeed, FRONTIER never refunded the $99.00.

160.    In fact, FRONTIER took advantage of GIMENEZ' minor child.

161.    On June 15, 2023, GIMINEZ contacted FRONTIER for a status on J.P.G.'s refund.

162.    At that time, GIMINEZ spoke to a FRONTIER agent claiming to be "Rena."

163.    "Rena" told GIMENEZ that she *would have* been able to refund them, but there was no "note in the system," and therefore FRONTIER *could not* provide any refund whatsoever.

164.    "Rena" gave GIMENEZ an email address to send a dispute request to FRONTIER for further review and follow-up.

165.    GIMENEZ submitted two (2) disputes to that email address, on June 15, 2023.

166.    In response, GIMENEZ was provided two (2) case numbers (CRM: 0485576 and CRM: 0485579) and two (2) incident numbers (INC230715-000985 and INC230715-000981), by FRONTIER.

167.    This time, in response to her disputes, FRONTIER responded with a new storyline, from FRONTIER's agent claiming to be "Abner F"—this time "Abner F" claimed that J.P.G.'s

bag exceeded the allowed "personal item" dimensions, which was and is a knowingly false statement by FRONTIER. (*See*, *e.g.*, *FIGURE 7*, above.)

168.    FRONTIER's statement was intentionally and/or recklessly false and misleading regarding the size of J.P.G.'s bag. (*See FIGURE 7*, above.)

169.    GIMENEZ responded multiple times to FRONTIER's false statements (CRM: 048557 and INC230715-009865), but she was never answered, and she remains ignored by FRONTIER.

170.    A few days later, GIMENEZ received a message from FRONTIER regarding her second complaint (CRM 0485579 and INC230715-000981).

171.    This response was word-for-word identical to FRONTIER's previous message in the other case and incident numbers—and it was from the same FRONTIER agent (*i.e.*, "Abner F") who apparently took multiple days to respond to GIMENEZ with the exact, word-for-word copied-and-pasted message as the previous response.

172.    FRONTIER's "Abner F" ignored everything else GIMENEZ had sent to FRONTIER in the meantime; "Abner F" barely even acknowledged GIMENEZ and ignored all of the disputed facts.

173.    J.P.G. paid the $99.00 fee himself, from money that was given to him by family for him to travel home that day, on June 7, 2023.

174.    In other words, FRONTIER took J.P.G.'s lunch money.

175.    J.P.G. was left with little to no money for food and water while traveling from ISP to MCO, which included 3 different connecting layovers.

176. FRONTIER's actions misled J.P.G. and induced them to purchase a FRONTIER ticket based on false and misleading representations claiming that J.P.G. 's ticket included one free "personal item" up to 14"H x 18"W x 8"D.

177. FRONTIER represented that GIMENEZ's ticket included one (1) free "personal item" with the dimension identified in *FIGURE 1* (above).

178. GIMENEZ relied on FRONTIER's representations when purchasing a ticket to travel with FRONTIER.

179. GIMENEZ relied on FRONTIER's representations that one (1) free "personal item" was included with her FRONTIER ticket.

180. GIMENEZ relied on FRONTIER's representations that a "personal item" was 14"H x 18"W x 8"D.

181. GIMENEZ relied on FRONTIER's representations that they would not be subject to any hidden or additional fees for their "personal item" after purchasing her ticket from FRONTIER.

182. GIMENEZ was reasonable in relying on FRONTIER's representations that the ticket prices were the full-fare price.

183. Based on FRONTIER's representations, GIMENEZ found FRONTIER's ticket price to be attractive and thus purchased FRONTIER's ticket.

184. FRONTIER's initial ticket price advertised to GIMENEZ induced GIMENEZ into purchasing a FRONTIER ticket and caused GIMENEZ to attempt to board the flight with one (1) "personal item."

185. GIMENEZ later found out that FRONTIER would charge an additional $99.00 fee that was hidden from them until they arrived at FRONTIER's gate to board the flight.

186.    Had GIMENEZ known that one (1) free "personal item" was not included in their ticket, GIMENEZ would have been able to make an informed decision as to whether to purchase the FRONTIER ticket and, if so, whether to purchase a "carry-on" at check-out for a significantly lower fee.

187.    FRONTIER's additional and hidden fee of $99.00 was charged to GIMENEZ even though their "personal item" was within the dimensions identified in *FIGURE 1* (above).

188.    FRONTIER's initial ticket price advertised to GIMENEZ was therefore false and misleading.

189.    As a result of FRONTIER's actions and omissions, GIMENEZ was harmed and suffered damages as herein alleged.

**(Facts Relative to Plaintiff ADRIENNE KRAFT)**

190.    KRAFT realleges paragraphs 1 through 94.

191.    KRAFT purchased the following FRONTIER flights:

(a)    from Denver (DEN) to Regan National Airport (DCA), on June 6, 2023;

(b)    from DCA to DEN on June 13, 2023; and,

(c)    from DIA to DCA, on June 27, 2023.

192.    KRAFT traveled with a "personal item" based on the representations made to her by FRONTIER in its advertisements and warranties during the ticket purchase process.

193.    KRAFT made sure to prepare a bag that was not more than 14" tall, 18" wide, and 8" deep.

194.    In fact, KRAFT's "personal item" was smaller than those dimensions, measuring approximately 12.5"Hx13.5"Wx8"D. (*See FIGURE 19* below.)

*FIGURE 19*



195.    However, on June 6, 2023, FRONTIER's gate agent at DEN forced KRAFT to pay $99.00 for her personal item, despite it being within the dimensions advertised by FRONTIER as a "personal item."

196.    This happened to KRAFT twice more, where she was again charged a $99.00 fee for the same "personal item," on June 13, 2023 (from DCA to DEN), and on June 27, 2023 (from DIA to DCA), for a total of $297.00 in additional charges for her "personal item."

197.   FRONTIER represented that KRAFT's ticket included one (1) free "personal item" with the dimension identified in *FIGURE 1* (above).

198.   KRAFT relied on FRONTIER's representations when purchasing a ticket to travel with FRONTIER.

199.   KRAFT relied on FRONTIER's representations that one (1) free "personal item" was included with her FRONTIER ticket.

200.   KRAFT relied on FRONTIER's representations that a "personal item" was 14"H x 18"W x 8"D.

201.   KRAFT relied on FRONTIER's representations that they would not be subject to any hidden or additional fees for their "personal item" after purchasing her ticket from FRONTIER.

202.   KRAFT was reasonable in relying on FRONTIER's representations that the ticket prices was the full-fare price.

203.   Based on FRONTIER's representations, KRAFT found FRONTIER's ticket price to be attractive and thus purchased FRONTIER's ticket.

204.   FRONTIER's initial ticket price advertised to KRAFT induced KRAFT into purchasing a FRONTIER ticket and caused PLAINTIFF to attempt to board the flight with one (1) "personal item."

205.   KRAFT later found out that FRONTIER would charge her a total of three (3) additional $99.00 baggage fees for her "personal item" that represented to her as being free until she was boarding her respective FRONTIER flights.

206.   Had KRAFT known that one (1) free "personal item" was not included in their ticket, PLAINTIFF would have been able to make an informed decision as to whether to purchase

the FRONTIER ticket and, if so, whether to purchase a "carry-on" at check-out for a significantly lower fee.

207.    FRONTIER's additional and hidden fee of $99.00 was charged to KRAFT even though their "personal item" was within the dimensions identified in *FIGURE 1* (above).

208.    KRAFT was charged three (3) separate $99.00 fees (totaling of $297.00) for her "personal item," even though it was not larger than the dimensions represented to her by FRONTIER.

209.    FRONTIER's initial ticket price advertised to KRAFT was therefore false and misleading.

210.    As a result of FRONTIER's actions and omissions, KRAFT was harmed and suffered damages as herein alleged.

**(Facts Relative to Plaintiff JOLENE YEADO)**

211.    YEADO realleges paragraphs 1 through 94.

212.    YEADO purchased a FRONTIER ticket to fly from DEN to Chicago Midway International Airport (MDW), on May 11, 2023.

213.    YEADO's ticket included a free "personal item" that was within the dimensions of 14" x 18" x 8".

214.    YEADO's bag was within the dimensions represented by FRONTIER, and her bag fit within the FRONTIER bag sizer at the gate. (*See FIGURE 20* below.)

*FIGURE 20*



215.    YEADO was charged $99.00 for her "personal item" despite it fitting inside the bag sizer.

216.    When YEADO was returning from MDW to DEN, she was again charged $56.00 for her "personal item" at the FRONTIER gate inside MDW, despite it fitting within the bag sizer, because FRONTIER threatened to charge her $99.00 again unless she purchased a "carry-on" through the FRONTIER mobile app before the flight.

217.    YEADO followed the directions of FRONTIER's agent and purchased the "carry-on" for $56.00, despite her bag being a "personal item," based on the representations made by FRONTIER's gate agent.

218.    YEADO's decision to do so was also influenced by her witnessing FRONTIER gate agents erroneously enforcing the "personal items" of a large number of passengers on a flight before hers.

219.    YEADO's "personal item" was a purse, which is exactly the type of bag that FRONTIER states as an example of what it considers a "personal item." [9]

220.    FRONTIER represented that YEADO's ticket included one (1) free "personal item" with the dimension identified in *FIGURE 1* (above).

221.    YEADO relied on FRONTIER's representations when purchasing a ticket to travel with FRONTIER.

222.    YEADO relied on FRONTIER's representations that one (1) free "personal item" was included with her FRONTIER ticket.

223.    YEADO relied on FRONTIER's representations that a "personal item" was 14"H x 18"W x 8"D.

224.    YEADO relied on FRONTIER's representations that they would not be subject to any hidden or additional fees for their "personal item" after purchasing her ticket from FRONTIER.

225.    YEADO was reasonable in relying on FRONTIER's representations that the ticket prices were the full-fare price.

226.    Based on FRONTIER's representations, YEADO found FRONTIER's ticket price to be attractive and thus purchased FRONTIER's ticket.

---

[9] *See FIGURE 1* above.

227.    FRONTIER's initial ticket price advertised to YEADO induced YEADO into purchasing a FRONTIER ticket and caused YEADO to attempt to board the flight with one (1) "personal item."

228.    YEADO later found out that FRONTIER would charge an additional $99.00 fee that was hidden from them until they arrived at FRONTIER's gate to board the flight.

229.    Had YEADO known that one (1) free "personal item" was not included in their ticket, PLAINTIFF would have been able to make an informed decision as to whether to purchase the FRONTIER ticket and, if so, whether to purchase a "carry-on" at check-out for a significantly lower fee.

230.    FRONTIER's additional and hidden fee of $99.00 was charged to YEADO even though their "personal item" was within the dimensions identified in *FIGURE 1* (above).

231.    FRONTIER's initial ticket price advertised to YEADO was therefore false and misleading.

232.    As a result of FRONTIER's actions and omissions, YEADO was harmed and suffered damages as herein alleged.

**(Facts Relative to Plaintiff SHARON PINE)**

233.    PINE realleges paragraphs 1 through 94.

234.    PINE purchased a ticket to fly FRONTIER from DEN to Atlanta (ATL), on January 11, 2023.

235.    PINE's ticket included a free "personal item" and she relied upon FRONTIER's representation for the size of a "personal item," when she prepared to travel on January 11, 2023.

236.    PINE's "personal item" was approximately 14"H x 17"W x 7.5"D. (*See FIGURE 21* below.)

*FIGURE 21*



237.    PINE was removed from the boarding line and asked to place her "personal item" in the FRONTIER bag sizer by one of FRONTIER's gate agents.

238.    PINE's "personal item" fit inside the FRONTIER bag sizer. (*See FIGURE 22* below.)

**FIGURE 22**



239.   Despite this, PINE was denied boarding her flight unless she paid $99.00 for her "personal item."

240.   FRONTIER represented that PINE's ticket included one (1) free "personal item" with the dimension identified in _FIGURE 1_ (above).

241.   PINE relied on FRONTIER's representations when purchasing a ticket to travel with FRONTIER.

242.   PINE relied on FRONTIER's representations that one (1) free "personal item" was included with her FRONTIER ticket.

243.   PINE relied on FRONTIER's representations that a "personal item" was 14"H x 18"W x 8"D.

244.   PINE relied on FRONTIER's representations that they would not be subject to any hidden or additional fees for their "personal item" after purchasing her ticket from FRONTIER.

245.   PINE was reasonable in relying on FRONTIER's representations that the ticket prices was the full-fare price.

246.   Based on FRONTIER's representations, PINE found FRONTIER's ticket price to be attractive and thus purchased FRONTIER's ticket.

247.   FRONTIER's initial ticket price advertised to PINE induced PINE into purchasing a FRONTIER ticket and caused PINE to attempt to board the flight with one (1) "personal item."

248.   PINE later found out that FRONTIER would charge an additional $99.00 fee that was hidden from them until they arrived at FRONTIER's gate to board the flight.

249.   Had PINE known that one (1) free "personal item" was not included in their ticket, PLAINTIFF would have been able to make an informed decision as to whether to purchase the

FRONTIER ticket and, if so, whether to purchase a "carry-on" at check-out for a significantly lower fee.

250.    Alternatively, had PINE known, she could have packed her "personal items" into her "carry-on bag" and purchased a "carry-on bag" online when she was purchasing her FRONTIER ticket at a reduced cost.

251.    FRONTIER's additional and hidden fee of $99.00 was charged to PINE even though their "personal item" was within the dimensions identified in *FIGURE 1* (above).

252.    FRONTIER's initial ticket price advertised to PINE was therefore false and misleading.

253.    As a result of FRONTIER's actions and omissions, PINE was harmed and suffered damages as herein alleged.

### (**Facts Relative to Plaintiff TESS GAYNOR**)

254.    GAYNOR realleges paragraphs 1 through 94.

255.    GAYNOR purchased a round-trip ticket from FRONTIER ticket from DCA to San Diego (SAN), on May 18, 2023, returning from SAN to DCA, on May 21, 2023.

256.    GAYNOR's ticket included one (1) free "personal item" and GAYNOR relied on this promise in preparing to travel on her FRONTIER flight.

257.    GAYNOR's bag measured approximately 12.5"H x 17.7"W x 6"D and was considered a tote or purse, like that which FRONTIER considers a "personal item" in *FIGURE 1* (above).

258.    GAYNOR was forced to pay $99.00 for her "personal item," in order to board her FRONTIER flight.

259.     GAYNOR's "personal item" fit inside the FRONTIER bag sizer prior to boarding her FRONTIER flight. (*See FIGURE 24* below.)

*FIGURE 24*



260.     GAYNOR was forced to pay $99.00 for additional bag fees, even though her bag fit inside FRONTIER's bag sizer.

261.     FRONTIER represented that GAYNOR's ticket included one (1) free "personal item" with the dimension identified in *FIGURE 1* (above).

262.     GAYNOR relied on FRONTIER's representations when purchasing a ticket to travel with FRONTIER.

263.     GAYNOR relied on FRONTIER's representations that one (1) free "personal item" was included with her FRONTIER ticket.

264.     GAYNOR relied on FRONTIER's representations that a "personal item" was 14"H x 18"W x 8"D.

265.    GAYNOR relied on FRONTIER's representations that they would not be subject to any hidden or additional fees for their "personal item" after purchasing her ticket from FRONTIER.

266.    GAYNOR was reasonable in relying on FRONTIER's representations that the ticket prices was the full-fare price.

267.    Based on FRONTIER's representations, GAYNOR found FRONTIER's ticket price to be attractive and thus purchased FRONTIER's ticket.

268.    FRONTIER's initial ticket price advertised to GAYNOR induced GAYNOR into purchasing a FRONTIER ticket and caused GAYNOR to attempt to board the flight with one (1) "personal item."

269.    GAYNOR later found out that FRONTIER would charge an additional $99.00 fee that was hidden from them until they arrived at FRONTIER's gate to board the flight.

270.    Had GAYNOR known that one (1) free "personal item" was not included in their ticket, PLAINTIFF would have been able to make an informed decision as to whether to purchase the FRONTIER ticket and, if so, whether to purchase a "carry-on" at check-out for a significantly lower fee.

271.    FRONTIER's additional and hidden fee of $99.00 was charged to GAYNOR even though their "personal item" was within the dimensions identified in *FIGURE 1*, above.

272.    FRONTIER's initial ticket price advertised to GAYNOR was therefore false and misleading.

273.    As a result of FRONTIER's actions and omissions, GAYNOR was harmed and suffered damages as herein alleged.

**(Facts Relative to Plaintiff CAMILLE CRAWFORD)**

274.     CRAWFORD realleges paragraphs 1 through 94.

275.     CRAWFORD purchased a FRONTIER ticket to fly from MCO to San Juan, Puerto Rico, on April 7, 2023 (Flight F9 128).

276.     CRAWFORD arrived at the gate with a "personal item" that measured no more than 14" tall, 18" wide, and 8" deep.

277.     FRONTIER forced CRAWFORD to pay an additional and hidden fee for her "personal item" despite her FRONTIER ticket including one (1) free "personal item."

[CONTINUED ON NEXT PAGE]

278.   CRAWFORD's "personal item" fit inside FRONTIER's "personal item" bag sizer. (*See FIGURE 25* below.)

### *FIGURE 25*



 

279.   CRAWFORD's "personal item" was well within the dimensions allowed by FRONTIER as a "personal item," as shown in *FIGURE 25* (above).

280.   CRAWFORD was forced to place her bag in FRONTIER's "personal item" bag sizer, inside which her "personal item" clearly fit.

281.    Despite the "personal item" clearly fitting inside FRONTIER's bag sizer, CRAWFORD was forced to pay an additional fee of $99.00 at the flight gate in order to board her flight.

282.    In addition to the price of PLAINTIFF's initial FRONTIER ticket, PLAINTIFF was forced to pay an additional, hidden fee of $99.00 for her one (1) "personal item" at the gate.

283.    PLAINTIFF was not allowed to board the flight unless and until the $99.00 fee was paid.

284.    CRAWFORD relied on FRONTIER's representations when purchasing a ticket to travel with FRONTIER.

285.    CRAWFORD relied on FRONTIER's representations that one (1) free "personal item" was included with her FRONTIER ticket, as provided in *FIGURE 1* (above).

286.    CRAWFORD relied on FRONTIER's representations that a "personal item" was 14"H x 18"W x 8"D.

287.    CRAWFORD relied on FRONTIER's representations that they would not be subject to any hidden or additional fees for their "personal item" after purchasing her ticket from FRONTIER.

288.    CRAWFORD was reasonable in relying on FRONTIER's representations that the ticket prices was the full-fare price.

289.    Based on FRONTIER's representations, CRAWFORD found FRONTIER's ticket price to be attractive and thus purchased FRONTIER's ticket.

290.    FRONTIER's initial ticket price advertised to CRAWFORD induced CRAWFORD into purchasing a FRONTIER ticket and caused CRAWFORD to attempt to board the flight with one (1) "personal item."

291.    CRAWFORD later found out that FRONTIER would charge an additional $99.00 fee that was hidden from them until they arrived at FRONTIER's gate to board the flight.

292.    Had CRAWFORD known that one (1) free "personal item" was not included in their ticket, CRAWFORD would have been able to make an informed decision as to whether to purchase the FRONTIER ticket and, if so, whether to purchase a "carry-on" at check-out for a significantly lower fee.

293.    FRONTIER's additional and hidden fee of $99.00 was charged to CRAWFORD even though their "personal item" was within the dimensions identified in *FIGURE 1* (above).

294.    FRONTIER's initial ticket price advertised to CRAWFORD was therefore false and misleading.

295.    As a result of FRONTIER's actions and omissions, CRAWFORD was harmed and suffered damages as herein alleged.

**(Facts Relative to Plaintiff JOANNE HINRICHS)**

296.    HINRICHS realleges paragraphs 1 through 94.

297.    HINRICHS purchased a FRONTIER ticket to fly from MCO to Milwaukee (MKE), on April 19, 2023 (Flight F9 1129).

298.    HINRICHS arrived at the gate with a "personal item" that measured no more than 14" tall, 18" wide, and 8" deep.

299.    HINRICHS' "personal item" measured approximately 14" tall, 16.5" wide, and 8" deep. (*See FIGURE 27* below.)

*FIGURE 27*



300.    HINRICHS' "personal item" did <u>not</u> fit inside FRONTIER's "personal item" bag

sizer, even though her "personal item" was not larger than 14" tall, 18" wide, and 8" deep.

301.    FRONTIER's "personal item" bag sizer that was used to measure HINRICHS'

"personal item" was smaller than FRONTIER represented to HINRICHS in *FIGURE 1*.

302.    In addition to the price of HINRICHS' initial FRONTIER ticket, HINRICHS was

forced to pay an additional, hidden fee of $99.00 for her one (1) "personal item" at the gate.

303.    HINRICHS was not allowed to board the flight unless and until the $99.00 fee was paid.

304.    FRONTIER forced HINRICHS to pay an additional and hidden fee for her "personal item" despite her FRONTIER ticket including one (1) free "personal item."

305.    FRONTIER represented that HINRICHS' ticket included one (1) free "personal item" with the dimension identified in *FIGURE 1* (above).

306.    HINRICHS relied on FRONTIER's representations when she was purchasing a ticket to travel.

307.    HINRICHS relied on FRONTIER's representations that one (1) free "personal item" was included with her FRONTIER ticket.

308.    HINRICHS relied on FRONTIER's representations that a "personal item" was 14"H x 18"W x 8"D.

309.    HINRICHS relied on FRONTIER's representations that they would not be subject to any hidden or additional fees for their "personal item" after purchasing her ticket from FRONTIER.

310.    HINRICHS was reasonable in relying on FRONTIER's representations that the ticket prices were the full-fare price.

311.    Based on FRONTIER's representations, HINRICHS found FRONTIER's ticket price to be attractive and thus purchased FRONTIER's ticket.

312.    FRONTIER's initial ticket price advertised to HINRICHS induced HINRICHS into purchasing a FRONTIER ticket and caused HINRICHS to attempt to board the flight with one (1) "personal item."

313.    HINRICHS later found out that FRONTIER would charge an additional $99.00 fee that was hidden from them until they arrived at FRONTIER's gate to board the flight.

314.    Had HINRICHS known that one (1) free "personal item" was not included in their ticket, PLAINTIFF would have been able to make an informed decision as to whether to purchase the FRONTIER ticket and, if so, whether to purchase a "carry-on" at check-out for a significantly lower fee.

315.    FRONTIER's additional and hidden fee of $99.00 was charged to HINRICHS even though their "personal item" was within the dimensions identified in *FIGURE 1* (above).

316.    FRONTIER's initial ticket price advertised to HINRICHS was therefore false and misleading.

317.    As a result of FRONTIER's actions and omissions, HINRICHS was harmed and suffered damages as herein alleged.

**(Facts Relative to Plaintiff MASON SPRAGUE)**

318.    SPRAGUE realleges paragraphs 1 through 94.

319.    SPRAGUE purchased a FRONTIER ticket for him and his wife, Karla Sprague, to fly from MKE to Las Vegas (LAS), on May 28, 2023 (Flight 2809).

320.    SPRAGUE arrived at the gate with a "personal item" for himself and his wife, Karla, each item having dimensions no more than 14" tall, 18" wide, and 8" deep.

321.    FRONTIER forced SPRAGUE to pay an additional and hidden fee for the "personal items" associated with his and his wife's FRONTIER tickets, despite their FRONTIER tickets including one (1) free "personal item" in the initial purchase price.

322.    SPRAGUE and his wife, Karla's, "personal items" fit inside FRONTIER's "personal item" bag sizer.

323.    SPRAGUE's "personal item" measured approximately 14" tall, 14" wide, and 8" deep. (*See FIGURE 28* below.)

*FIGURE 28*



324.    In addition to the price of SPRAGUE's initial FRONTIER ticket, SPRAGUE was forced to pay an additional, hidden fee of $69.00 for his one (1) "personal item" at the gate, as well as another $69.00 for his wife Karla's one (1) "personal item" at the gate.

325.    SPRAGUE and his wife Karla were not allowed to board the flight unless and until the $69.00 fee was paid for SPRAGUE and Karla's "personal items," even though they fit inside

the FRONTIER bag sizer and measured within the "personal item" dimensions posted by FRONTIER.

326.   FRONTIER represented that SPRAGUE and his wife's tickets each included one (1) free "personal item" having the dimensions identified in *FIGURE 1* (above).

327.   SPRAGUE and his wife Karla relied on FRONTIER's representations when she was purchasing a ticket to travel.

328.   SPRAGUE and his wife Karla relied on FRONTIER's representations that one (1) free "personal item" was included with her FRONTIER ticket.

329.   SPRAGUE and his wife Karla relied on FRONTIER's representations that a "personal item" was 14"H x 18"W x 8"D.

330.   SPRAGUE and his wife Karla relied on FRONTIER's representations that they would not be subject to any hidden or additional fees for their "personal item" after purchasing their tickets from FRONTIER.

331.   SPRAGUE and his wife Karla were reasonable in relying on FRONTIER's representations that their ticket prices were the full-fare price.

332.   Based on FRONTIER's representations, SPRAGUE and his wife Karla found FRONTIER's ticket price to be attractive and SPRAGUE thus purchased FRONTIER's ticket.

333.   FRONTIER's initial ticket price advertised to SPRAGUE induced SPRAGUE into purchasing a FRONTIER ticket and caused SPRAGUE and his wife Karla to attempt to board the flight with one (1) "personal item."

334.   SPRAGUE and his wife Karla later found out that FRONTIER would charge an additional $69.00 fee for their "personal items" that was hidden from them until they arrived at FRONTIER's gate to board the flight.

335.     Had SPRAGUE and his wife Karla known that one (1) free "personal item" was not included in their ticket, or that the "personal item" size was smaller than advertised, SPRAGUE and his wife Karla would have been able to make an informed decision as to whether to purchase the FRONTIER ticket and, if so, whether to purchase a "carry-on" at check-out for a significantly lower fee.

336.     FRONTIER's additional and hidden fee of $69.00 was charged twice (totaling $138.00) to SPRAGUE even though their "personal items" were within the dimensions identified in *FIGURE 1* (above).

337.     FRONTIER's initial ticket price advertised to SPRAGUE was therefore false and misleading.

338.     As a result of FRONTIER's actions and omissions, SPRAGUE was harmed and suffered damages as herein alleged.

**(Facts Relative to Plaintiff BEATA URBANOWICZ)**

339.     URBANOWICZ realleges Paragraphs 1 through 94.

340.     URBANOWICZ purchased FRONTIER tickets for her and her four (4) friends (Diana Dizon, Sherron Brick, Beatriz Romer-Corona, and Reselma Martinez) to fly from MCO to Chicago (ORD), on April 29, 2023 (Flight F9 44).

341.     Each FRONTIER ticket was represented to include one (1) free "personal item" as defined in *FIGURE 1*, above.

342.     URBANOWICZ and her four (4) friends arrived at the gate with their "personal items" that measured no more than 14" tall, 18" wide, and 8" deep.

343.    URBANOWICZ' "personal item" measured approximately 11.5" tall, 15.5" wide, and 8" deep. (*See FIGURE 29* below.)

***FIGURE 29***



[CONTINUED ON NEXT PAGE]

344.    Diana Dizon's "personal item" measured approximately 13" tall, 16" wide, and 8"

deep. (*See FIGURE 30* below.)

*FIGURE 30*



[CONTINUED ON NEXT PAGE]

345.    Sherron Brick's "personal item" measured approximately 12.5" tall, 15.5" wide, and 8" deep. (*See FIGURE 31* below.)

***FIGURE 31***

346.    Romer-Corona and Martinez' "personal items" also were not more than FRONTIER's dimensions for "personal items" as stated in *FIGURE 1* (above).

347.    URBANOWICZ and her four (4) friends' "personal items" did <u>not</u> fit inside FRONTIER's "personal item" bag sizer, even though the "personal items" were <u>not</u> larger than the dimension represented to them by FRONTIER.

348.    FRONTIER's "personal item" bag sizer was smaller than the dimensions represented to URBANOWICZ and her four (4) friends.

349.    URBANOWICZ and her four (4) friends were not allowed to board the flight unless and until the $99.00 fee was paid for URBANOWICZ and her four (4) friends' "personal items."

350.    FRONTIER represented that URBANOWICZ and her four (4) friends' tickets each included one (1) free "personal item" with the dimension identified in *FIGURE 1* (above).

351.    In addition to the price of URBANOWICZ' initial FRONTIER ticket, URBANOWICZ  and her four (4) friends were each forced to pay an additional, hidden fee of $99.00 for their one (1) "personal item" at the gate, even though FRONTIER represented to PLAINTIFF that their ticket included one (1) free "personal item."

352.    URBANOWICZ relied on FRONTIER's representations when they were purchasing a ticket to travel for herself and her five (5) friends.

353.    URBANOWICZ and her five (5) friends relied on FRONTIER's representations that one (1) free "personal item" was included with their FRONTIER ticket.

354.    URBANOWICZ and her five (5) friends relied on FRONTIER's representations that a "personal item" was 14"H x 18"W x 8"D.

355.    URBANOWICZ relied on FRONTIER's representations that they would not be subject to any hidden or additional fees for their "personal item" after purchasing their ticket from FRONTIER.

356.    URBANOWICZ and her four (4) friends were reasonable in relying on FRONTIER's representations that the ticket prices were the full-fare price and that a "personal item" had the dimensions stated in *FIGURE 1* (above).

357.    Based on FRONTIER's representations, URBANOWICZ and her five (5) friends found FRONTIER's ticket price to be attractive and thus purchased FRONTIER's ticket.

358.    FRONTIER's initial ticket price advertised to URBANOWICZ induced URBANOWICZ into purchasing a FRONTIER ticket and caused URBANOWICZ and her friends to attempt to board the flight with one (1) "personal item" for each of their five (5) FRONTIER tickets.

359.    URBANOWICZ later found out that FRONTIER would charge an additional $99.00 fee that was hidden from them until they arrived at FRONTIER's gate to board the flight.

360.    Had URBANOWICZ and her friends known that one (1) free "personal item" was not included in their ticket, URBANOWICZ and her friends would have been able to make an informed decision as to whether to purchase the FRONTIER ticket and, if so, whether to purchase a "carry-on" at check-out for a significantly lower fee.

361.    FRONTIER's additional and hidden fee of $99.00 was charged to URBANOWICZ at least five (5) times (once for herself and each of her four (4) friends, totaling $495.00), even though URBANOWICZ and her friends' "personal items" were within the dimensions identified in *FIGURE 1* (above).

362.    FRONTIER's initial ticket prices advertised to URBANOWICZ were therefore false and misleading.

363.    As a result of FRONTIER's actions and omissions, URBANOWICZ was harmed and suffered damages as herein alleged.

## **CLASS CERTIFICATION**

364.    Plaintiffs reallege paragraphs 1 through 363 as though fully set forth herein.

365.    This action is maintainable as a class action on behalf of the Plaintiffs.

366.    The Plaintiffs believe that the class that they mean to represent is so numerous that joinder of all members is impracticable.

367.    The Plaintiffs assert that thousands of consumers have been, and are being, impacted by the FRONTIER's actions.

368.    The widespread impact of FRONTIER's actions is evidenced by social media posts referencing FRONTIER's baggage fees. (*See*, *e.g.*, *FIGURE 32*, below, showing two viral videos with over 400,000 combined "likes" on TikTok, as of May 31, 2023).

### FIGURE 32



369.    The questions of law and fact common to the class, and the claims of Plaintiffs, are typical of the claims of the class of Plaintiffs.[10]

370.    FRONTIER's conduct herein alleged has grown to viral status on TikTok, with some videos garnering over a million views and counting.

---

[10] https://www.tiktok.com/discover/class-action-lawsuit-frontier

**("Classes")**

371.    Plaintiffs bring this action on behalf of themselves, and all others similarly situated class members (the "Class" or "Classes") pursuant to Rule 23(a) and Rule 23(b)(2)-(3) of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 23(a), (b)(2)-(3).

372.    Plaintiffs seeks class certification on behalf of the classes defined below:

    (a) **NATIONWIDE CLASS.** All persons in the United States who purchased a FRONTIER ticket from January 1, 2020, to Present, who were denied boarding with their "personal item" unless they paid an additional baggage fee.

    (b) **FLORIDA SUBCLASS.** All persons in the State of Florida who purchased a FRONTIER ticket from January 1, 2020, to Present, who were denied boarding with their "personal item" unless they paid an additional baggage fee.

373.    Excluded from the Classes is FRONTIER and any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

374.    Together, the above-mentioned National Class and Florida Subclass shall be collectively referred to as the "Class" or "Classes."

375.    Proposed Members of said Classes will be referred to as "Class Members" or otherwise referenced as "members of the Class."

**("Numerosity")**

376.    The members of the Class are so numerous that joinder of all members of the Class is impracticable.

377.     Plaintiff is informed and believes that the proposed Class/Sub-Class contains thousands of passengers/consumers who have been damaged by FRONTIER's conduct as alleged herein.

378.     The precise number of Class members is unknown to Plaintiff at this time.

379.     However, since July 1, 2023, more than 140 potential members of the Classes have completed intake questionnaires after reaching out to Plaintiffs' counsel, not including potential Class members who did not complete questionnaires.

### **("Typicality")**

380.     Plaintiffs' claims are typical to those of all Class members because members of the Class are similarly injured through FRONTIER's uniform misconduct described herein and were subject to FRONTIER's deceptive practices and statements.

381.     Plaintiffs are advancing the same claims and legal theories on behalf of themselves, and all members of the Class and Sub-Class.

### **("Commonality")**

382.     Plaintiffs' claims raise questions of law and fact common to all members of the Class, and they predominate over any questions affecting only individual Class members.

383.     The claims of Plaintiffs and all prospective Class members involve the same alleged defects and misconduct.

384.     These common legal and factual questions include the following:

(a)     Whether FRONTIER's tickets are false, defective, misleading, and/or inoperable;

(b)     Whether FRONTIER owed a duty of care to Plaintiffs and the Class;

(c)     Whether FRONTIER knew or should have known that their tickets and "free personal items" claims were defective and/or inoperable;

(d)     Whether FRONTIER wrongfully represented, and continues to misrepresent, that their tickets include free personal items;

(e)     Whether FRONTIER's actions and omissions are true, or are misleading, or objectively reasonably likely to deceive;

(f)     Whether the alleged conduct constitutes violations of the laws asserted;

(g)     Whether FRONTIER's alleged conduct violates public policy;

(h)     Whether FRONTIER's representations in advertising, warranties, packaging, and labeling are false, deceptive, and misleading;

(i)     Whether those representations are likely to deceive a reasonable consumer;

(j)     Whether a reasonable consumer would consider the risk of their "personal item" not fitting inside FRONTIER's bag sizer or whether a reasonable consumer would consider the risk of their properly sized personal item being rejected by FRONTIER's gate agent;

(k)     Whether FRONTIER was unjustly enriched as a result of its marketing and practices;

(l)     Whether FRONTIER breached their express warranties;

(m)     Whether FRONTIER breached their implied warranties;

(n)     Whether certification of any or all of the classes proposed herein is appropriate under Rule 23, Fed. R. Civ. P.;

(o)     Whether Plaintiffs and the Class Members are preempted from bringing claims under the Federal Deceptive and Unfair Trade Practices Act ("FDUTPA");

(p)     Whether Plaintiffs and the Class Members are entitled to damages and/or restitution and the proper measure of that loss; and,

(q)     Whether an injunction is necessary to prevent FRONTIER from continuing to deny "personal items" that are within the required measurements.

### **("Adequacy")**

385.    Plaintiffs and their counsel will fairly and adequately protect and represent the interests of each member of the class.

386.    Plaintiffs has retained counsel experienced in complex litigation and class actions.

387.    Plaintiff's counsel has the resources and abilities to fully litigate and protect the interests of the Plaintiffs and the Class.

388.    Plaintiffs intends to prosecute this claim vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Class, nor are Plaintiffs subject to any unique defenses.

### **("Superiority")**

389.    A class action is superior to the other available methods for a fair and efficient adjudication of this controversy.

390.    The damages or other financial detriment suffered by Plaintiffs and the individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against FRONTIER.

391.    It would thus be virtually impossible for plaintiffs and Class Members, on an individual basis, to obtain meaningful and effective redress for the wrongs done to them.

392.     Further, it is desirable to concentrate the litigation of the Class Members' claims in one forum, as it will conserve party and judicial resources and facilitate the consistency of adjudications.

393.     Plaintiffs knows of no difficulty that would be encountered in the management of this case that would preclude its maintenance as a class action.

## <u>COUNT I</u>

**DECEPTIVE OR MISLEADING PRACTICES,
IN VIOLATION OF FLORIDA'S DECEPTIVE AND
UNFAIR TRADE PRACTICES ACT ("FDUTPA")
(Fla. Stat. § 501.201 *et seq.*)**

**(On Behalf of Plaintiffs and the Classes)**

394.     Plaintiffs incorporate the allegations contained in Paragraphs 1 through 393 by reference as if fully set forth herein.

395.     FDUTPA operates to protect consumers from unscrupulous business practices such as unfair methods of competition, unconscionable acts, or practices, and unfair or deceptive acts or practice, in the conduct or trade of a business.

396.     FRONTIER engaged in conduct that was consumer-oriented and did so in a manner which was materially deceptive and misleading to consumers, and this conduct caused harm and damages to Plaintiffs.

397.     By way of example, FRONTIER made representations and omissions regarding its operations that fraudulently induced Plaintiffs to purchase a round-trip ticket with the Defendant.

398.     FRONTIER materially misled the Plaintiffs in the manner discussed above, including by failing to conspicuously disclose information regarding the total cost of the flight, the structure and amount of its baggage fees and other fees, the bag sizer, and baggage rates at the

airport and gates, as discussed above, and that FRONTIER had the "lowest fares," as represented by FRONTIER.

399.   As a result of FRONTIER's [mis]representations and omissions, the Plaintiffs suffered losses, including funds expended for tickets, unforeseen fees, embarrassment, and inconveniences.

400.   The Plaintiffs seek punitive damages to deter FRONTIER and other airlines from continuing its deceptive and misleading business practices, which it continues doing as of the date of this filing, and to punish FRONTIER for its gross misconduct against the public, including the Plaintiff and similarly situated members of the class.

<u>**COUNT II**</u>

**BREACH OF CONTRACT
UNDER FLORIDA'S COMMON LAW**

**(On Behalf of Plaintiffs and the Classes)**

401.   Plaintiffs incorporate the allegations contained in Paragraphs 1 through 393 by reference as if fully set forth herein.

402.   FRONTIER created a contract with plaintiffs and the Class through its marketing, advertisements, and promises.

403.   FRONTIER represented that the costs of a ticket would be a set amount when, in fact, FRONTIER charged Plaintiffs additional fees for services that a reasonable consumer would believe to be part of the bargain reached between the parties on the basis of the representations made.

404.   FRONTIER was also under a contractual obligation to provide the Plaintiffs with material information concerning the total cost of services, including but not limited to the total

cost of the flight, the structure and amount of its baggage fees and other fees, and the specific size of the personal item portion of its bag sizers located at the gate.

405.   FRONTIER failed in its obligation to provide the Plaintiffs with this aforesaid information.

406.   After the Plaintiffs expended funds on FRONTIER's flight, FRONTIER uncloaked numerous hidden fees to the Plaintiffs that were unanticipated and unforeseen, let alone contradictory to its previous representations at the time the reservation was made.

407.   At the time of booking, the Plaintiffs were unaware that they would have to pay an additional fee for a seat on the plane with a personal item.

408.   Additionally, the structure of FRONTIER's baggage fees is and was confusing and designed to extract additional fees from consumers, including the Plaintiffs.

409.   FRONTIER advertised its fare in a misleading manner so that the Plaintiffs were fraudulently induced to purchase a round-trip ticket with FRONTIER.

410.   FRONTIER breached its agreement with the Plaintiffs when it charged the Plaintiffs unanticipated and/or hidden fees.

411.   FRONTIER intentionally locked the Plaintiffs into a non-refundable ticket purchase prior to disclosing all of the fees involved and waited until approximately thirty (30) minutes before boarding the flight to disclose the additional fees to the Plaintiffs.

412.   As a result of FRONTIER's [mis]representation and omissions, the Plaintiffs suffered losses, including funds expended on tickets, fees, embarrassment, and inconvenience, due to FRONTIER's fraudulent activity.

413.   FRONTIER failed to perform their obligations under the contract in that FRONTIER failed to provide Plaintiffs and the Class a free "personal item" with each ticket.

414.   Plaintiff and the Class have been damaged as a direct and proximate result of FRONTIER's breach.

415.   Plaintiffs and the Class seek actual damages, attorneys' fees, and costs, as stated below in their Prayer for Relief.

**COUNT III**

**FRAUDULENT MISREPRESENTATION
UNDER FLORIDA COMMON LAW**

**(On Behalf of Plaintiffs and the Classes)**

416.   Plaintiffs incorporate the allegations in Paragraphs 1 through 393 by reference as if fully set forth herein.

417.   While inducing the Plaintiffs to purchase tickets and throughout the contractual relationship between the parties, FRONTIER made numerous representations that were materially false, and FRONTIER made numerous material omissions.

418.   FRONTIER sold the Plaintiffs a round-trip ticket with the knowledge that what the consumer would ultimately pay would be significantly higher than the price represented.

419.   FRONTIER's misrepresentations and omissions included but are not limited to:

    (a)   Representing to the Plaintiffs to be "the lowest fares";

    (b)   Representing to the Plaintiffs that its "fares include one personal item" with a maximum size of 14"H x 18"W x 8"D;

    (c)   Advertising prices that were and continue to be misleading as to the total cost to consumers flying with FRONTIER;

    (d)   Engaging in deceptive trade practices with a bait and switch scheme;

    (e)   Maintaining a bag sizer that is smaller than its purported maximum dimensions for personal items;

(f)      Failing to make it clear to consumers that a ticket does not include fees incurred after the ticket purchase;

(g)      Deliberately failing to make its fee structure clear to consumers (Plaintiffs) at the time of purchase, especially when consumers (Plaintiffs) purchased tickets through a third-party vendor;

(h)      Withholding certain material information regarding the total pricing of a flight until the consumers have expended resources and are irreversibly committed to taking the flight (*i.e.*, when they are in line for boarding the flight, approx. 30 minutes before departure); and,

(i)      Failing to make necessary disclosures to the Plaintiffs of its baggage fee structure which is confusing and intended to extract significant hidden fees from consumers (Plaintiffs).

420.    FRONTIER knew, or acted with reckless disregard for the truth, as to all of the material misrepresentations that are alleged in this Complaint.

421.    FRONTIER knew, or acted with reckless disregard for the trust, as to all of the material omissions alleged in this Complaint.

422.    FRONTIER knew and intended that the Plaintiffs would rely on FRONTIER's false and misleading representations in the Plaintiffs' decisions to purchase a round-trip ticket with FRONTIER.

423.    FRONTIER knew that the Plaintiffs would rely on the information provided to them by FRONTIER in the Plaintiffs' decisions to purchase a round-ticket with FRONTIER and FRONTIER intended to influence the Plaintiffs' decisions by omitting material information.

424.    The Plaintiffs reasonably relied on FRONTIER's false and misleading representations in deciding to purchase round-trip tickets from FRONTIER.

425.    In deciding to purchase a ticket from FRONTIER, the Plaintiffs reasonably and justifiably believed that FRONTIER was providing all material information prior to purchasing, and the Plaintiffs' decisions were influenced by FRONTIER's omissions and misrepresentations.

426.    The Plaintiffs' reliance on FRONTIER's misrepresentations and/or omissions caused them significant, specific harm and damages, as alleged hereinabove.

427.    The Plaintiffs seek punitive damages to deter FRONTIER and other "budget" airlines from continuing its fraudulent practices, which it continues as of the date of this filing, and to punish FRONTIER for its gross misconduct against the public, including HAMAD and similarly situated members of the class (Plaintiffs).

## COUNT IV

### MISLEADING ADVERTISING,<br>IN VIOLATION OF FLORIDA STATUTORY LAW<br>(Fla. Stat. § 817.41 *et seq.*)

#### (On Behalf of Plaintiffs and the Classes)

428.    Plaintiffs incorporate the allegations contained in Paragraphs 1 through 393 by reference as if fully set forth herein.

429.    Florida laws provide a statutory cause of action for misleading advertising that gives the prevailing party a basis of relief to recover attorneys' fees and punitive damages, under Fla. Stat. § 817.41.

430.    Florida law makes it unlawful "for any person to make or disseminate or cause to be made or disseminated before the general public of the state, or any portion thereof, any misleading advertisement." Fla. Stat. § 817.41(1).

431. Such conduct "shall constitute and is hereby declared to be fraudulent and unlawful, designed and intended for obtaining money or property under false pretenses." Fla. Stat. § 817.41(1).

432. There is a "rebuttable presumption" that the named Defendant of any misleading advertisement "is responsible for such misleading advertisement or unlawful sale." Fla. Stat. § 817.41(4).

433. Florida defines a "misleading advertising" under section 817.40(5), Florida Statutes, which provides the following in pertinent part:

> The phrase "misleading advertising" includes any statements made, or disseminated, in oral, written, electronic, or printed form or otherwise, to or before the public, or any portion thereof, which are known, or through the exercise of reasonable care or investigation could or might have been ascertained, to be untrue or misleading, *and which are or were so made or disseminated with the intent or purpose, either directly or indirectly, of selling or disposing of real or personal property, services of any nature whatever, professional or otherwise, or to induce the public to enter into any obligation relating to such property or services*.

Fla. Stat. § 817.40(5) (emphasis added).

434. FRONTIER made or disseminated, or caused to be made or disseminated, before the general public of the state, "misleading advertisements," as defined by Fla. Stat. § 817.41.

435. FRONTIER was the representor, because it made, disseminated, or causes same, on its website and its personal item portion of its bag sizer.

436. FRONTIER made a misrepresentation of material facts, because FRONTIER did deceive the Plaintiffs and other consumers into paying for a personal item that was within the size specifications by presenting the Plaintiffs with a bag sizer that was smaller than advertised on its website and/or arbitrarily enforced by FRONTIER's gate agents.

437.    FRONTIER knew that the personal item portion of its bag sizer was smaller than 14"H x 16"W x 8"D and therefore knew of the falsity of the personal item size purportedly included in the fares.

438.    Even if FRONTIER did not actually know that its personal item portion of its bag sizer was smaller than advertised, it *should have known* of the falsity of the statement by measuring the bag sizer advertising and enforcing it before the public.

439.    For example, a simple measuring tape would have identified the falsity of FRONTIER's statements.

440.    FRONTIER incentivized its gate agents by providing them bonuses and/or commissions for each passenger that they were able to charge with a hidden baggage fee at the gates.

441.    FRONTIER intended that the herein alleged misrepresentation would induce the Plaintiffs to rely and act on it (the bag sizer) by arriving at the gate with personal items that were not larger than 14"H x 18"W x 8"D and ending having to pay the more expensive (undisclosed) baggage fees at the gate, last minute, before boarding their flight.

442.    FRONTIER knew that the Plaintiffs would not pay for their personal items online (at a lower cost) if FRONTIER advertised the size of personal items online.

443.    As a result of the Plaintiffs reliance on FRONTIER's representations, the Plaintiffs suffered injuries and/or damages.

## COUNT V

**NEGLIGENCE**
**UNDER FLORIDA COMON LAW**

**(On Behalf of Plaintiffs and the Classes)**

444.   Plaintiffs incorporate the allegations contained in Paragraphs 1 through 393 by reference as if fully set forth herein.

445.   FRONTIER, at all times material, had a duty to provide one (1) free personal item to consumers who purchased flights from FRONTIER or through a third-party vendor.

446.   FRONTIER, at all times material, breached this duty by designing, producing, marketing, and selling tickets that were not honored by FRONTIER's gate agents.

447.   FRONTIER's breach of this duty caused damages to Plaintiffs and the Classes.

448.   Plaintiffs were damaged in that they lost the benefit of the bargain, suffered economic loss through lack of refund, suffered inconveniences due to denial of entry and/or refund, and has suffered emotional distress in their attempts to simply get their money back.

449.   FRONTIER's actions caused damages both factually and proximately.

450.   But for FRONTIER's conduct herein alleged, Plaintiffs and the Classes would not have been damaged.

451.   At all times material, it was foreseeable that FRONTIER's actions would cause damages as Plaintiffs and the Class purchased FRONTIER's tickets to fly with one free "personal item" and failure to allow one free personal item.

452.   Due to FRONTIER's conduct, Plaintiffs and the Classes were damaged by FRONTIER in that Plaintiffs and the Classes have been deprived at least one free personal item with their tickets and been coerced into paying predatory fees as high as $99.00 per "personal item" or have been prevented to board their flights.

## COUNT VI

**NEGLIGENT MISREPRESENTATION**
**UNDER FLORIDA COMMON LAW**

**(On Behalf of Plaintiffs and the Classes)**

453.   Plaintiffs incorporate the allegations contained in Paragraphs 1 through 393 by reference as if fully set forth herein.

454.   Through their advertising and the course of their regular business, FRONTIER made representations to Plaintiffs and the Class concerning the function, operability, and validity of its flight tickets.

455.   FRONTIER did not practice reasonable care in the above-mentioned design, creation, production, sale, and marketing of the tickets.

456.   FRONTIER made these statements as to guide consumers, such as Plaintiffs and the Class, in the transactional process of purchasing its tickets and preparing for travel.

457.   FRONTIER knew that such statements would be relied upon, the fact that FRONTIER's tickets included one (1) free "personal item" measuring 14"x18"x8", by Plaintiffs and the Class, given that the statements were the entire reason did not purchase a carry-on.

458.   Plaintiffs and the Class would not have been charged for their "personal items" without being misled by FRONTIER's advertising statements and assertions put forth by Defendants.

459.   FRONTIER intended that Plaintiffs and the Class rely upon the representations made by FRONTIER regarding what was included with its tickets.

460.   Plaintiffs and the Class reasonably relied upon such representations and omissions to their detriment as they suffered damages.

461.   As a result, Plaintiffs and the Classes have suffered damages in an amount to be proven at trial.

462.   Due  to FRONTIER's conduct, Plaintiffs and the Classes were damaged by FRONTIER in that Plaintiffs and the Class were deprived of their benefit of the bargain and were forced to pay additional hidden fees at the gate or missed travel that they will not get back.

463.   Plaintiffs and the Classes seek damages as stated in the Prayer for Relief below.

### COUNT VII

**UNJUST ENRICHMENT
UNDER FLORIDA COMMON LAW**

**(On Behalf of Plaintiffs and the Classes)**

464.   Plaintiffs incorporate the allegations contained in Paragraphs 1 through 393 by reference as if fully set forth herein.

465.   Plaintiffs and the Class bestowed benefits upon FRONTIER in the form of monies that were paid in exchange for FRONTIER's tickets.

466.   These benefits bestowed by Plaintiffs were not a donation to FRONTIER as these monies were given for the purchase of the tickets, which included one (1) free "personal item."

467.   As a result of FRONTIER's wrongful and deceptive conduct alleged herein, FRONTIER knowingly and voluntarily demanded, accepted, and retained wrongful benefits in the form of money paid by the Plaintiffs and members of the Class when they were forced to pay for carry-on bag fees at FRONTIER's gates for their "personal items."

468.   In doing so, FRONTIER acted with conscious disregard for the rights of Plaintiffs and members of the Class.

469.   Plaintiffs and the Class paid for tickets that included one free "personal item," and Plaintiffs and the Class were forced to pay additional fees solely for their "personal items."

470.    Instead of receiving one free "personal item" with their tickets, Plaintiffs and the Class received something entirely difference and unusable in fact for their "personal items."

471.    As a result of FRONTIER's wrongful conduct as alleged herein, FRONTIER has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the Class.

472.    FRONTIER's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct herein alleged.

473.    It is inequitable for FRONTIER to be permitted to retain the benefits it received, and is still receiving, without justification, from the false and deceptive manufacturing, labeling, and marketing of its tickets to Plaintiffs and members of the Class.

474.    FRONTIER's retention of such funds under circumstances making it inequitable to do so, constitutes unjust enrichment.

475.    The financial benefits derived by FRONTIER rightfully belongs to Plaintiffs and members of the Class.

476.    As such, the circumstances make FRONTIER's retention of funds inequitable, without reimbursement for the funds to Plaintiffs and the Class.

477.    FRONTIER should be compelled to disgorge in a common fund for the benefit of Plaintiffs and members of the Class all wrongful or inequitable proceeds received by FRONTIER, plus interest thereon.

478.    Plaintiffs and the Class seek damages as stated in the Prayer for Relief below.

<u>**COUNT VIII**</u>

**BEACH OF EXPRESS WARRANTY**
**UNDER FLORIDA COMMON LAW**

**(On Behalf of Plaintiffs and the Classes)**

479.    Plaintiffs incorporate the allegations contained in Paragraphs 1 through 393 by reference as if fully set forth herein.

480.    As detailed above, FRONTIER, through its advertising and marketing expressly warranted that its tickets were for the purposes intended, that they were merchantable quality, and that they actually included one free "personal item" measuring 14" x 18" x 8".

481.    Such statements constitute an affirmative promise that its tickets will indeed allow consumers to board with a "personal item" without additional baggage fees.

482.    FRONTIER breached this express warranty by denying passengers from boarding flight with their "personal items" unless they paid additional baggage fees for their "personal items."

483.    FRONTIER's tickets, for whatever reason, were not honored by its gate agents and Plaintiffs and members of the Class were required to pay additional baggage fees at their gates or else they would not be allowed to board their flights.

484.    FRONTIER breached their express warranties because the tickets at issue are defective and unfit for use to board with a "personal item" without additional fees.

485.    FRONTIER's breach of warranty proximately caused damages as it is foreseeable that such defective tickets, incapable of delivering their warranties, would deprive Plaintiffs and the Class of their benefit of the bargain and monies paid for such tickets.

486.    FRONTIER was given notice of this breach through number Plaintiffs' complaints and refund requests, as well as through social media and other media outlets.

487.     Plaintiffs and other Class Members have suffered harm on account of FRONTIER's breach of its express warranty regarding the fitness for use of the tickets and are entitled to damages to be determined at trial.

488.     Plaintiffs and the Class seek damages, attorneys' fees, and costs as stated in the Prayer for Relief below.

## COUNT IX

### BREACH OF IMPLIED WARRANTY
### OF FITNESS FOR A PARTICULAR PURPOSE
### UNDER FLORIDA COMMON LAW

#### (On Behalf of Plaintiffs and the Classes)

489.     Plaintiffs incorporate the allegations contained in Paragraphs 1 through 393 by reference as if fully set forth herein.

490.     FRONTIER's tickets were to be used for one free "personal item" specifically for their purchased flights under that ticket. Thus, FRONTIER's tickets were of a particular purpose.

491.     FRONTIER knew of this particular purpose as FRONTIER produced, marketed, sold, and advertised the tickets as including one free "personal item," and even provided bag sizers at its gates purportedly measuring 14"Hx18"Wx8"D in maximum sizes.

492.     FRONTIER knew that Plaintiffs relied on this promise of particularity as FRONTIER was aware of the assertions put forth regarding specificity and Plaintiffs' required reliance on such a product.

493.     Plaintiffs relied on FRONTIER's skill and capability to provide such a specific product.

494.     Due to FRONTIER's conduct, Plaintiffs were damaged by FRONTIER in that Plaintiffs were deprived the benefit of the bargain and loss of $99.00 and/or have missed travel that they will never get back due to lost time and expenses.

495.     Plaintiff and the Class seek damages, attorneys' fees, and costs as stated below in the Prayer for Relief.

## COUNT X

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### UNDER FLORIDA COMMON LAW

**(On Behalf of Plaintiffs and the Classes)**

496.     Plaintiffs incorporate the allegations contained in Paragraphs 1 through 393 by reference as if fully set forth herein.

497.     FRONTIER sold the tickets to Plaintiffs and other consumers.

498.     Plaintiffs are persons who are reasonably expected to use such tickets, given that the tickets were sold to the public and Plaintiffs are consumers.

499.     FRONTIER is a commercial airline in the business of selling flights to consumers.

500.     FRONTIER presented the tickets as operable for one free "personal item" on all purchased flights under the tickets.

501.     FRONTIER's tickets were not merchantable at the time of sale given that they did not provide one free "personal item" to Plaintiffs and the Class.

502.     This lack of merchantability is a breach of warranty by FRONTIER.

503.     FRONTIER's breach both factually and proximately caused damages to Plaintiffs through their loss of funds, deprivation of their benefit of the bargain, missed trips and other travel opportunities, emotional distress, and inconvenience faced throughout the process of remedying the issues related the additional baggage fee charges.

504.    Plaintiffs notified FRONTIER of this breach and lack of merchantability through their conversations with FRONTIER's gate agents at the time of its breach and thereafter through calls, messages, and other communications to FRONTIER regarding its failure to provide one free "personal item" with its tickets.

505.    Plaintiffs and the Class seek actual damages, attorneys' fees, and costs as stated in the Prayer for Relief below.

**COUNT XI**

**STRICT LIABILITY FOR MISREPRESENTATION
UNDER FLORIDA COMMON LAW**

**(On Behalf of Plaintiffs and the Classes)**

506.    Plaintiffs incorporate the allegations contained in Paragraphs 1 through 393 by reference as if fully set forth herein.

507.    FRONTIER was engaged in the business of selling flights and airline tickets.

508.    FRONTIER misrepresented the material fact that its tickets included one free "personal item" with each flight to those who purchased tickets.

509.    This fact is material.

510.    Often times the "personal item" baggage fees charged to Plaintiffs and the Class exceeded the costs of their airfare.

511.    FRONTIER's misrepresentations were made to the public at large and potential consumers through FRONTIER's advertising and marketing.

512.    Plaintiffs and the Class were and are persons who reasonably expected to use the tickets as marketed by FRONTIER.

513.    This reasonability is based upon the fact that Plaintiffs and the Class are consuming members of the public who purchased the tickets relying on FRONTIER's marketing.

514.    It is reasonably foreseeable that Plaintiffs and the Class would be harmed by FRONTIER's misrepresentation.

515.    Plaintiffs and the Class suffered damages due to FRONTIER's misrepresentations.

516.    Due to FRONTIER's conduct, Plaintiffs and the Class were damaged by FRONTIER in that Plaintiffs and the Class have been deprived of their benefit fo the bargain and loss of monies for additional baggage fees and have missed travel opportunities that they will never get back due to lost time and expenses.

517.    Plaintiffs and the Class seek actual damages, attorneys' fees, and costs as stated below in the Prayer for Relief.

**COUNT XII**

**FRAUD**
**UNDER FLORIDA COMMON LAW**

**(On Behalf of Plaintiffs and the Classes)**

518.    Plaintiffs incorporate the allegations contained in Paragraphs 1 through 393 by reference as if fully set forth herein.

519.    FRONTIER made a fraudulent misrepresentation of material fact in that FRONTIER marketed, sold, and promised Plaintiffs a ticket that would include a free "personal item" on the associated flights.

520.    This fact of the tickets providing a free "personal item" is material as Plaintiffs' additional bag fees sometimes exceeded the cost of airfare.

521.    Plaintiffs and the Class would not have paid $99.00 at the FRONTIER gate for "carry-on" bas had they known their tickets did not include "personal items" or that FRONTIER would not honor their promises.

522.    Plaintiffs and the Class relied on FRONTIER's misrepresentations in their purchase of the tickets and in their payment of the additional baggage fees at their gates.

523.    Plaintiffs and the Class were justified in relying on this misrepresentation as the true nature of the tickets was not known to Plaintiffs and the Class, and FRONTIER promised a ticket would include a free "personal item" for each flight.

524.    Plaintiffs and the Class have suffered damages as a direct and proximate result of this misrepresentation as Plaintiffs have lost out on their benefit of the bargain, lost funds stemming from their ticket's promise of free "personal items," suffered emotional distress, and have been greatly inconvenienced by FRONTIER's inoperable tickets for use as one free "personal item."

525.    Plaintiffs and the Class seek actual damages, attorneys' fees, and costs as stated below in the Prayer for Relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs and members of the Class, individually, and on behalf of similarly situated others, by and through their undersigned counsel, hereby respectfully requests this Honorable Court find in favor of the Plaintiffs, and against Defendant FRONTIER AIRLINES, INC., and award the following to Plaintiffs and members of the Class:

A.    Declaratory judgment, under Fla. Stat. § 501.211, that the Defendant's acts or practices violated the FDUTPA and enjoin the Defendants from continuing such acts or practices;

B.    Order that the Defendant discontinue the unfair and deceptive trade practices;

C.    Require the Defendant to disclose its fee structure *clearly and conspicuously*;

D.    Require the Defendant to disclose and clearly post its personal item dimensions on its bag sizers at the gates of the airports in which it operates;

E.      Require the Defendant to disclose and clearly post its baggage fees for each level of the contractual relationship, from online to in the airport and at the gate, and whether or not consumers can use mobile or online platforms at each stage;

F.      Require the Defendant to disclose the dimensions of its bag sizer online *clearly and conspicuously* online, in the airport, and at its gates (if different);

G.      Require the Defendant to clearly and conspicuously inform consumers that it is **<u>not</u>** the "lowest fare" and that personal items are **<u>not</u>** included in its fares;

H.      Order that the Defendant must reimburse the Plaintiffs for actual damages, under Fla. Stat. §§ 501.211(2) and 817.41.

I.      Order that the Defendant reimburse Plaintiffs for any and all ticket costs, costs that the Plaintiffs incurred related to the purchase of the Defendant's tickets, and any and all fees paid, including but not limited to baggage, seat, and cancellation fees;

J.      Order that the Defendant reimburse the Plaintiffs for all of the fees and costs paid to the Defendant, all travel and lodging expenses incurred as a result of the Defendant's fraudulent conduct, and all amounts paid to other carriers;

K.      Order that the Defendant pay all statutory fines, under the laws of Florida, for the willful conduct, in an amount of **TEN THOUSAND DOLLARS ($10,000.00)** for each violation of the FDUTPA, under Fla. Stat. 501.2075;

L.      Order that the Defendant pay for the Plaintiffs' emotional suffering and harm, as permitted by Fla. Stat. § 501.213;

M.      Order that the Defendant pay the Plaintiffs for all monetary and other losses, as permitted by Fla. Stat. § 501.213;

N.       Require the Defendant to pay statutory fines, costs of suit, and attorneys' fees, including those identified under Fla. Stat. § 501.2105;

O.       Award Plaintiffs and the Class actual damages, attorneys' fees, and costs;

P.       Punitive damages in an amount of not less than **ONE HUNDRED MILLION DOLLARS ($100,000,000.00)**, for the blatant, wanton, malicious, and intentional nature of the Defendant's gross misconduct, to deter the Defendant and other airlines from further similar conduct, as provided for under Fla. Stat. §§ 501.213 and 817.41(6); and,

Q.       Grant the Plaintiffs any and all other and further relief as this Honorable Court may find just and proper.

## DEMAND FOR JURY TRIAL

WHEREFORE, the Plaintiffs and members of the Class, individually and on behalf of similarly situated others, by and through their undersigned counsel, hereby demand a trial by jury as to all issues and counts so triable.

DATED: September 29, 2023.                 Respectfully submitted,

*/s/ Mike Mann*
**MIKE MANN, ESQ.**
Fla. Bar No. 1020249
The Cochran Firm Orlando, LLC
605 East Robinson Street, Suite 330
Orlando, Florida 32801
Telephone: (407) 271-8590
Facsimile: (407) 271-8059
MMann@cochranfirmorlando.com
Service@cochranfirmorlando.com
***Attorney for Plaintiffs and Class.***

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing First Amended Class

Action Complaint was electronically filed with the Clerk of Court via this Court's CM/ECF e-

filing portal, which will electronically serve e-notices to all parties and counsel of record, including

the following, this 29th Day of September 2023:

**HOLLAND & KNIGHT, LLP**
SUZANNE E. GILBERT, ESQ.
Suzanne.Gilber@hklaw.com
KRISTEN N. ROYAL, ESQ.
Kristen.Royal@hklaw.com
200 South Orange Avenue, Suite 2600
Orlando, Florida 32801
Telephone (407) 425-5288
Facsimile (407) 244-5288
*Local Counsel for Defendant*
*FRONTIER AIRLINES, INC.*

**. . . AND . . .**

**HOLLAND & KNIGHT, LLP**
SARAH KORAPATY, ESQ.
Sarah.Koropaty@hklaw.com
*Out-of-State Counsel (Pending Pro*
*Hac Vice Admission) for Defendant*
*FRONTIER AIRLINES, INC.*

*/s/ Mike Mann*
MIKE MANN, ESQ.